912 So.2d 227 (2003)
MUSGROVE CONSTRUCTION, INC.
v.
Charles E. MALLEY.
2020093.
Court of Civil Appeals of Alabama.
December 12, 2003.
Certiorari Denied April 16, 2004.
Opinion on Return to Remand February 25, 2005.
Certiorari Denied May 13, 2005.
*231 Tracy P. Turner of Johnstone, Adams, Bailey, Gordon & Harris, L.L.C., Mobile, for appellant.
Halron W. Turner and Marc E. Bradley of Turner, Onderdonk, Kimbrough & Howell, P.A., Chatom, for appellee.
Alabama Supreme Court 1030464.
Alabama Supreme Court 1040828.

On Applications for Rehearing
CRAWLEY, Judge.
The opinion of this court issued August 8, 2003, is withdrawn, and the following is substituted therefor.

I. Facts and Procedural History
Charles E. Malley ("the worker") was employed by Musgrove Construction, Inc. ("the company"), as a journeyman lineman. The company constructs and maintains power lines. The worker's job required him to work on and near energized power lines. On May 27, 1998, the worker was connecting a jumper tap line to the main line neutral from the bucket of a bucket truck approximately 35 feet above the ground. He successfully connected the jumper tap line on one end with a wooden-handled tool he referred to as the "squeeze tool." However, while using the tool to connect another portion of the jumper tap line to the neutral line, the worker was electrocuted by 7200 volts of electricity.
After being electrocuted, the worker chose to avoid further electrocution by unhooking his safety lanyard and exiting the bucket. He then fell to the ground, landing on his right shoulder and head. The worker suffered electrical burns over 12% of his body. The worker also suffered a torn rotator cuff in his right shoulder; headaches and dizziness from striking his head on the ground; and carpal tunnel syndrome, which can manifest itself as a result of electrocution, in his right hand. He also developed post-traumatic stress disorder and depression as a result of his injuries.
The worker sued the company, seeking workers' compensation benefits. After a trial, the trial court determined the worker to be 100% permanently, totally disabled and awarded benefits accordingly. The company appeals, arguing that, pursuant to Ala.Code 1975, § 25-5-51, the worker's willful misconduct in violating company safety rules requiring him to wear rubber gloves while working within reach of an energized power line and to wear a safety harness and lanyard while in the bucket precludes an award of compensation or, at least, precludes an award of 100% permanent, total disability based upon the combination of the worker's restrictions caused by both his electrical burns and the injuries he suffered as a result of his fall from the bucket. In addition, the company argues that the trial court erred by refusing to order the worker to submit to a functional capacities evaluation ("FCE"), that the trial court erred by failing to admit certain testimony, and that the award of 100% permanent, total disability is not supported by substantial evidence.

II. Standard of Review
Our review of this case is governed by the Workers' Compensation Act, Ala.Code 1975, § 25-5-1 et seq., which states, in pertinent part: "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Ala.Code 1975, § 25-5-81(e)(2). Therefore, this court "will view the facts in *232 the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996). Further, a trial court's finding of fact is supported by substantial evidence if it is "supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25-5-81(e)(1); see also Ex parte Trinity Indus., 680 So.2d at 268.

III. Whether the Trial Court Erred by Failing to Order the Worker to Undergo a Functional Capacities Evaluation
The company argues that the trial court erred by failing to order the worker to undergo an FCE. The company had requested that the worker undergo an FCE; the worker refused. The company then filed a motion to compel the worker to undergo an FCE with the trial court. The company relied on both Ala.Code 1975, § 25-5-77(b), and Rule 35(a), Ala. R. Civ. P., in support of its motion. After conducting a hearing on the motion, consulting written briefs in support and in opposition of the motion, and considering excerpts of the deposition testimony of four of the worker's physicians, the trial court denied the motion without explanation.
Because the company based the motion on both Rule 35(a) and § 25-5-77(b), we can affirm the trial court only if its denial of the motion was proper under both bases. If the trial court's denial of the motion is improper under either basis, we must reverse. As explained in the following discussion, there was insufficient evidence before the trial court for it to determine, under § 25-5-77(b), whether the company's motion to compel the FCE should have been granted. Therefore, we need not consider whether the trial court's denial of the company's motion to compel was proper under Rule 35(a). Accordingly, we reverse the judgment of the trial court on that issue and remand for further proceedings as detailed below.
The company argues on appeal that Beatrice Foods Co. v. Gray, 431 So.2d 1299 (Ala.Civ.App.1983), requires reversal of the trial court's denial of the company's motion to compel the FCE. In Beatrice Foods, this court reversed a trial court's judgment determining that the worker was permanently and totally disabled on the basis that the trial court had erred by refusing to compel the worker to undergo an additional medical examination and a vocational assessment. Beatrice Foods, 431 So.2d at 1300. The worker had injured her back at work, and the employer sought an additional medical examination to determine if the worker had injured a disc in her back and a vocational assessment to determine the worker's vocational status. Id. Two of the worker's physicians indicated that they believed the worker had injured a disc in her back but that they were unable to confirm their suspicions; one of those physicians suggested that the worker see a physician in Mobile who could administer a new screening test for disc injuries. Id. One of the worker's physicians stated that he thought the worker could do jobs other than the one in which she was injured; another physician recommended that the worker be evaluated at a vocational-rehabilitation agency. Id. The worker had agreed to both examinations. Id. However, when the company requested that the trial court order the evaluations, the trial court denied the company's motion. Id.
*233 This court reversed the decision of the trial court, noting that Ala.Code 1975, § 25-5-77(b), requires a worker to undergo medical examinations at all reasonable times by a physician of the company's choosing and that § 25-5-77(c) requires a worker to undergo vocational rehabilitation if the company requests that the worker do so. Id. The court pointed out that if a worker unreasonably refuses to submit to either a medical examination or vocational rehabilitation, workers' compensation benefits must be suspended. Id. Although the court noted that the question whether a worker's refusal to submit to a medical examination or vocational rehabilitation is reasonable is a question of fact, the court reversed the trial court's decision, commenting that the worker had not refused the treatment and, therefore, there was no reasonable refusal upon which the court could base its decision to deny the company's requests. Id.
Unlike the worker in Beatrice Foods, the worker in the present case did not consent to the FCE requested by the employer; therefore, in that particular respect, Beatrice Foods is distinguishable. However, the basic law discussed in Beatrice Foods is still applicable. The worker's refusal to submit to the FCE must be reasonable. See Beatrice Foods, 431 So.2d at 1300.
"The threshold determination of the reasonableness of the [company's] request, and thus of the reasonableness of any refusal of the [worker] to submit to an examination, is `a question of fact for the trier of fact.'" Jimoco, Inc. v. Smith, 777 So.2d 716, 718 (Ala.Civ.App.2000) (quoting Health Care Auth. of Huntsville v. Henry, 600 So.2d 324, 327 (Ala.Civ.App.1992)). This court may not reverse the trial court's determination on this question of fact if the trial court's finding is supported by substantial evidence. Id. In addition, when a trial court does not make a specific finding of fact, this court must presume it would have made those findings necessary to support its judgment if those findings would be supported by evidence contained in the record. Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992).
The present case presents a dilemma. The trial court held a hearing on the company's motion to compel the worker to submit to an FCE. However, at that hearing, the trial court took no testimony and listened only to the arguments of counsel. The only evidence presented to the court was the prescription for an FCE by one of the worker's physicians and excerpts of the depositions of four of the worker's physicians. Those deposition excerpts indicated that the physicians all thought that either an FCE or vocational retraining might be appropriate for the worker but that none of the doctors had indicated that they had actually ordered an FCE during their treatment of the worker. Therefore, we cannot presume that the trial court made a factual finding that the company's request for the FCE was unreasonable or that the worker's refusal to submit to the FCE was reasonable because the trial court was presented no evidence from which to make such a determination. Accordingly, we must reverse the trial court's denial of the company's motion to compel the worker to undergo an FCE and remand the case for the trial court to take evidence on the reasonableness of the company's request for an FCE and the worker's refusal to submit to the FCE as prescribed by his physician.
However, the reversal of this particular issue does not resolve all of the remaining issues in this case. We need not address whether the trial court's determination that the worker is 100% permanently and totally disabled is supported by substantial *234 evidence at this time because, if the trial court determines on remand that the worker's refusal to submit to the FCE is not reasonable and thus requires him to submit to an FCE, the vocational-rehabilitation counselors or the worker's physicians may wish to revise their opinions based upon information gleaned during the FCE. However, because the issue whether the worker committed willful misconduct has been decided by the court and because the results of any FCE that might result from our remand will not impact that determination, we will address the company's arguments concerning that issue on appeal. In addition, we will address the company's arguments concerning testimony the trial court excluded.

IV. Did the Worker Commit "Willful Misconduct"?
The company argues that the trial court erred by determining that the worker's failure to wear his rubber gloves and his safety lanyard was not willful misconduct precluding an award of compensation pursuant to § 25-5-51. That section reads, in pertinent part, as follows:
"[N]o compensation shall be allowed for an injury or death caused by the willful misconduct of the employee, by the employee's intention to bring about the injury or death of himself or herself or of another, his or her willful failure or willful refusal to use safety appliances provided by the employer...."
The burden of proof on the issue of a worker's willful misconduct is on the employer. Ala.Code 1975, § 25-5-36.
Both our supreme court and this court have considered the application of the "willful misconduct" bar in several cases. One of the earlier cases that discussed the application of the willful-misconduct bar adopted the view that "the mere violation of rules, when not willful or intentional, is not `willful misconduct' within the meaning of the law." Ex parte Woodward Iron Co., 212 Ala. 220, 225, 102 So. 103, 107 (1924). The court further explained that "the phrase `willful misconduct,' as used in the [Workmen's Compensation Act], includes all conscious or intentional violations of definite law or definitely prescribed rules of conduct, as to which obedience is not discretionary, as contradistinguished from inadvertent, unconscious, or involuntary violations thereof." Ex parte Woodward Iron, 212 Ala. at 223, 102 So. at 105-06.
As questions arose as to what exactly constituted a "willful" violation of a law or rule, the supreme court explained that "[t]he test is not the doing of an act for the purpose and with the specific intent of violating a rule, but the willful and conscious doing of the act which is in violation of the reasonable rule known to the [worker]." Sloss-Sheffield Steel & Iron Co. v. Greer, 216 Ala. 267, 270, 113 So. 271, 273 (1927). The court explained that a worker may be guilty of willful misconduct without having an intent to break the rule, that is, without having "thought or deliberated as to the rule and its breach." Greer, 216 Ala. at 269, 113 So. at 273. Specifically, the court commented that an employer, to establish that a worker was guilty of willful misconduct, should show:
"that the [worker] intentionally did an act which is in violation of a known and reasonable rule, that was known to the [worker], and that the act was with a knowledge and appreciation on the part of the [worker], of what that violation involved, and the natural and probable result of the misconduct in the premises."
Id. The court summed up its discussion by stating that "[i]f, then, the [worker] knows the rule, and the natural, probable, and serious result of its violation and with such knowledge does the act of violation, such act is deliberately done and is willful misconduct." *235 Greer, 216 Ala. at 270, 113 So. at 273.
The supreme court further explained the concept of a "willful" violation of a law or rule in Sloss-Sheffield Steel & Iron Co. v. Nations, 236 Ala. 571, 183 So. 871 (1938). The court first commented that Greer had held that the employer need not show that the worker "was thinking of the rule at the time, and entertained the specific intent to violate it." Nations, 236 Ala. at 575, 183 So. at 873. The court then went further to define "willful," stating:
"`"Willful," as used in the statute, imports something more than a mere exercise of the will in doing the act. It imports a wrongful intention. An intention to do an act that [the worker] knows, or ought to know, is wrongful or forbidden by law. It involves the idea of a premeditation and determination to do the act, though known to be forbidden.'"
Id. (quoting King v. Empire Collieries Co., 148 Va. 585, 590, 139 S.E. 478, 479 (1927)). The court further noted that the Virginia court had commented that a willful failure or refusal involved more than mere ignorant failure to comply with a rule or statute. Id. Finally, the court held that "what amounts to a willful failure or refusal to comply with a [rule or law] is dependent upon the circumstances, and [is] to be determined upon the particular facts of each case." Nations, 236 Ala. at 575, 183 So. at 874.
More recent cases involving application of the willful-misconduct bar have only once resulted in a denial of workers' compensation benefits. See Ex parte Bowater, 772 So.2d 1181 (Ala.2000) (reversing the Court of Civil Appeals' reversal of a trial court's judgment denying compensation to a worker injured by a machine that he admittedly failed to "lock out" as required by the employer's rules). In two other cases, this court determined that the employer had failed to prove that the worker was guilty of willful misconduct. See NeSmith v. H & A Indus. Painting, Inc., 775 So.2d 223 (Ala.Civ.App.2000) (reversing the trial court's denial of benefits because the employer had failed to prove that the worker was guilty of willful misconduct), and Town of Addison v. Cooke, 689 So.2d 184 (Ala.Civ.App.1997) (affirming a trial court's award of benefits because the employer had failed to prove that the worker was guilty of willful misconduct). The most recent case to mention the willful-misconduct bar fails to discuss its application at length. See Ex parte Holton, 886 So.2d 83, 86-87 (Ala.2003). However, that opinion does give a definition of the word "willful": "`The usual meaning assigned to "willful," ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.'" Ex parte Holton, 886 So.2d at 87 n. 4 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 344 at 213 (5th ed.1984)).
Thus, to summarize over 75 years of law on the willful-misconduct bar, a worker commits willful misconduct involving a violation of an employer's rule or regulation when the worker knows that rule, he understands the consequences of disobeying that rule, he deliberately chooses to disobey the rule, and his choice to disobey that rule is unreasonable under the circumstances, as explained in Ex parte Holton, 886 So.2d at 87 n. 4. With those principles in mind, we will now consider whether the trial court's determinations that the worker was not guilty of willful misconduct when he failed to wear his rubber gloves and when he removed *236 his safety lanyard are supported by substantial evidence.

A. Whether the Worker's Failure to Wear Rubber Gloves Was Willful Misconduct
The company argues that the worker was guilty of willful misconduct because he removed his rubber gloves while working within reach of an energized line. The company's safety manual contains the following rule concerning the use of rubber gloves by lineman:
"31-3 USE AND CARE OF RUBBER GLOVES
"a. Properly rated rubber gloves with protectors must be worn by employees when:
"1. Working on any structure within reach of energized conductors or conductive equipment, including those below normal neutral or lowest neutral position."
The company argues that the worker was clearly within reach of an energized line while he was completing his work on the neutral line. Thus, the company contends, the trial court's determination that the worker's failure to use the rubber gloves was not willful misconduct is not supported by substantial evidence. The worker argues that the trial court correctly concluded that he was not guilty of willful misconduct because, he says, the company failed to prove that he was aware of the company rule, that he was within reach of an energized line when he was working on the main line neutral, and that the electrocution was caused by his failure to wear the rubber gloves.
The worker testified that he wore his rubber gloves as he placed the safety appliances, a rubber gut and a rubber safety blanket, over the energized line. He said he then lowered the bucket to the neutral line[1] on which he would be working and removed his rubber gloves. He said that he had never been given a safety manual by the company; the company was unable to locate a signed form in the worker's personnel file indicating that the worker had received the safety manual. The worker did testify that he was aware of an industry standard that required linemen to wear their rubber gloves if they were within reach of an energized line. However, he said that he did not think he was that close to the energized line while he was working on the neutral line, and he stated that, if he had thought he were within reach of the energized line, he would have worn his rubber gloves. The worker testified that the tool he was using when he was electrocuted appeared in pictures to be approximately two feet from the energized line, but that he thought that he was farther from the line than the pictures appeared to show.
When explaining the actual electrocution, the worker opined that the electricity entered his body through his right side or perhaps his right arm. He showed the trial court all of his scars and the lack of any burn injuries to his hands. Although the company presented testimony tending to indicate that electricity does not always leave an entrance wound, it presented no evidence requiring a determination that the electricity entered the worker's body through his hands.
*237 The trial court found specifically that the worker had never received the safety manual containing the rule requiring that rubber gloves be worn when a lineman was within reach of an energized line. The trial court also found that the company had failed to prove that the worker had been within reach of an energized line when he was electrocuted. Finally, the trial court found that the company had failed to prove that the worker's electrocution injuries were caused by his failure to wear the rubber gloves.
In light of the evidence presented, we need not consider whether the worker's admitted knowledge of the industry standard in accord with the company's rule calls into doubt the trial court's finding that the worker did not have knowledge of the safety rule. We agree that the conflicting evidence on the distance between the worker and the energized line would support a determination that the company had not proven that the worker was "within reach" of the energized line as he worked on the neutral line. Perhaps more importantly, the trial court's determination that the company failed to prove that the worker's failure to wear rubber gloves actually caused the electrocution is supported by the evidence, or, more specifically the lack of evidence, of the entrance wound on the worker's body. Thus, we affirm the trial court's determination that the worker's failure to wear rubber gloves did not amount to willful misconduct.

B. Whether the Worker's Removal of the Safety Lanyard Amounts to Willful Misconduct
The company argues that the worker's removal of his safety lanyard so that he could exit the bucket also amounts to willful misconduct under the statute. The evidence at trial was undisputed that the worker had been instructed by his supervisor to wear his safety harness and safety lanyard while working in the bucket. The worker testified that he knew he was required to wear the harness and lanyard any time he was working in the bucket. He then testified that he purposefully unhooked his lanyard for the express purpose of exiting the bucket. Thus, the company concludes, the worker admitted willful misconduct.
The trial court specifically found that the worker did not willfully or intentionally fail to use a safety lanyard. The judgment recites the fact that the worker was wearing the harness and lanyard at all times during his work in the bucket until he was electrocuted. At that time, the trial court found, the worker removed the lanyard to avoid continued electrocution, which, according to the trial court, the worker perceived would result in his death. The trial court concluded that the worker's decision to remove his lanyard was not willful misconduct.
At trial, the worker testified that he had been wearing his harness and lanyard on the day of the accident. He described the events leading up to the electrocution by reciting that he retrieved the materials and tools required for his job, that he entered the bucket and secured his safety harness and lanyard, and that he then raised the bucket to the power lines above. He said that, after the electricity exited his body through his foot, he leaned back and felt another shock. He then attempted to crawl under the neutral line on which he was working; he said that his lanyard "caught him," so he then unhooked it so that he could pull himself out of the bucket because the bucket was "hot." He stated that he thought if he remained in the bucket he would die.
Unlike our decision to affirm the trial court's conclusion that the worker's failure to use his rubber gloves was not *238 willful misconduct, our decision on this allegation of willful misconduct is much more difficult. There is no question that some of the worker's injuries resulted from his 35-foot fall; therefore, causation for those injuries is proven. The worker himself admitted knowledge of the rule and, in fact, obeyed the rule up until he felt that his life was threatened by remaining in the bucket. Thus, the worker knew the rule and knew that, by unhooking his lanyard, he would be exposed to the danger of falling from the bucket. However, the trial court apparently concluded that the worker's decision to jump from the bucket in the face of his perception that he would be further electrocuted or killed was not unreasonable under the circumstances presented. The trial court's conclusion is supported by the testimony at trial. The worker's choice to exit the bucket was made quickly and in fear of further danger of electrocution. Therefore, we affirm the trial court's determination that the worker's removal of his safety lanyard was not willful misconduct precluding an award of benefits.

V. Whether the Trial Court Wrongfully Excluded Certain Testimony
The company argues that the trial court erred by refusing to admit certain testimony offered at trial. First, the company argues that the trial court wrongfully excluded the testimony of Wayne McCart, the worker's supervisor, concerning McCart's ability to work outdoors in the heat after having suffered electrical burns on approximately 30% of his body. Secondly, the company argues that the trial court wrongfully excluded McCart's testimony concerning his opinion of how the accident that injured the worker occurred. Finally, the company challenges the trial court's exclusion of the testimony of Dean Hills, the company's safety director, who would have testified about whether the worker's conduct in removing his rubber gloves and in unhooking his safety lanyard were violations of the company's safety rules and about his opinion of how the accident that injured the worker occurred.

A. Whether the Trial Court Erred by Excluding McCart's Testimony Concerning His Ability to Work in Spite of His Electrocution Injuries
The company, during its direct examination of Wayne McCart, the worker's supervisor, attempted to elicit from McCart testimony concerning McCart's electrocution injuries and his ability to work as a lineman in the heat since suffering those injuries. The worker objected to that testimony on the grounds that it was irrelevant to the issue whether the worker was able to work. The trial court sustained the objection, commenting that the comparison of the worker to McCart would be "the equivalent of one person having an automobile accident and another person having an automobile accident and comparing injuries." The trial court also commented that the court had not been presented with any medical testimony concerning McCart.
On appeal, the company urges us to reverse the trial court's determination that the proffered testimony was irrelevant. The company contends that McCart's testimony concerning his ability to work outdoors in the heat and to do heavy manual labor is relevant to the issue whether the worker is precluded from those activities on the basis of his injuries. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala. R. Evid. "Rulings on the materiality, relevancy, and remoteness of evidence are matters resting within the discretion of the trial court. Such *239 rulings will not be disturbed . . . unless there is a showing that the court's ruling was a gross abuse of discretion." Moseley v. Lewis & Brackin, 583 So.2d 1297, 1300 (Ala.1991); see also AmSouth Bank, N.A. v. Spigener, 505 So.2d 1030 (Ala.1986); accord Rule 401, Ala. R. Evid., Advisory Committee's Notes ("Relevancy remains a question over which the trial court has wide discretion.").
We cannot agree with the company that McCart's testimony that he was electrocuted and was burned over 30% of his body and yet was able after suffering his injuries to work outdoors and in the heat doing the same job as the worker is relevant to the issue whether the worker can perform his job as a journeyman lineman. Although we need not discuss the testimony of the worker's various physicians at length, we note that each of them testified as to the worker's limited abilities in some way, including specifically his ability to work in the heat, his ability to work at heights, and his ability to stand for long periods of time. As the trial court noted when discussing the worker's objection to McCart's proffered testimony, the trial court had no information concerning what, if any, restrictions McCart's physicians had assigned to him, no information on the degree of the burns McCart suffered, and no information on the level of pain experienced by McCart after his injury. We agree with the trial court's conclusion that to permit McCart's testimony on the issue would be to compare two people and their responses to injury without complete information on one of those persons and his injury. The trial court concluded that such testimony would not serve to make any fact at issue more or less probable and therefore excluded the testimony on the ground that it was not relevant. We see no "gross abuse of discretion," and we affirm the trial court's evidentiary ruling as to McCart's testimony concerning his own injury.

B. Whether the Trial Court Erred by Excluding McCart's Testimony Regarding His Opinion of How the Worker's Accident Occurred
The company also argues that the trial court erred by excluding McCart's testimony regarding his opinion of how the worker was injured. The evidence in the record clearly indicates that McCart heard the arcing of electricity as he sat in his pickup truck completing paperwork, but that he did not see the electrocution actually occur. However, at trial, the company attempted to elicit testimony from McCart about his opinion, based on his investigation of the scene of the accident, of how the worker was electrocuted. The worker objected, arguing, among other things, that McCart was not an expert in electrical-accident reconstruction. The trial court sustained that objection. In addition, the trial court itself questioned McCart on whether he actually saw the electrocution or observed the worker at all during the accident, other than when he saw the worker climb out of the bucket; McCart admitted that his testimony was based not on an observation of the accident but on his viewing of the accident scene after the accident.
The company argues that McCart could state his opinion even if he were not qualified as an expert because Rule 701, Ala. R. Evid., permits opinion testimony by lay witnesses. That Rule 701 permits opinion testimony by lay witnesses is indeed true. However, a lay witness may only testify as to his or her opinion if the opinion is "rationally based on the perception of the witness" and will be "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Rule 701. The Advisory Committee's *240 Notes on the first portion of Rule 701, which requires the opinion to be rationally based on the witness's perception, indicate that "[t]his is no more than a restatement of the `firsthand knowledge rule,' found in Ala. R. Evid. 602, tailored to opinions. No lay witness may give an opinion based upon facts that the witness did not actually observe."
McCart's testimony, while based on the view of the area in which the accident occurred, was not based on firsthand knowledge of the conditions at the time of the electrocution. He admitted that he did not witness the actual electrocution but that he did see the worker as he exited the bucket and fell to the ground. McCart testified that he took several photographs of the accident scene. McCart said he took some photographs from the ground, before the bucket was moved, and that he then took other photographs once the bucket had been lowered and raised to the approximate level at which it had been when the worker was working on the line. The trial court could have determined that McCart's opinion of what happened was based on speculation produced by McCart's viewing of the scene after the electrocution and not on actual firsthand knowledge. Accordingly, because the company has not shown a gross abuse of the trial court's discretion, we affirm the trial court's exclusion of this proffered testimony as well.

C. Whether the Trial Court Erred by Excluding Hills's Testimony Regarding His Opinion of How the Worker's Accident Occurred
The company also argues that the trial court erred by excluding the proffered opinion testimony of the company's safety director, Dean Hills. Hills, while being questioned as part of an offer of proof on whether he believed that the worker had violated the company's safety rules, testified that, in his opinion, the accident that injured the worker would not have occurred if the worker had been wearing his rubber gloves. The worker objected to that testimony, and the trial court sustained the objection.
The company argues, as it did in the case of McCart's testimony on causation, that Hills should have been permitted to testify as to his opinion on the cause of the worker's accident. As discussed above, in general, opinion testimony may be permitted if a lay witness has firsthand knowledge of the facts upon which he bases that opinion. Rule 701. The worker contends that the trial court properly sustained the objection because Hills's knowledge as to the cause of the accident was not firsthand.
Hills testified that he arrived in Alabama to view the accident scene the day following the accident. Therefore, it is clear that he did not witness the actual accident. He did view, from the ground, the site of the accident; he said the rubber blanket and gut and the pop tool were in the same locations as they were the day before because he had instructed McCart not to move anything. He did not view the accident scene from the bucket; in fact, the bucket truck, which he did inspect, was parked at McCart's house. As was the case with McCart's proffered testimony regarding the cause of the accident, the trial court could have determined that Hills's testimony was not based on firsthand knowledge of the accident but was instead speculation based on a later view of the accident scene from the ground, after removal of the bucket truck. Therefore, because the company has not demonstrated a gross abuse of the trial court's discretion, we affirm the trial court's exclusion of Hills's testimony on his opinion of the cause of the worker's accident.

*241 D. Whether the Trial Court Erred by Excluding Hills's Testimony on Whether the Worker's Conduct Violated the Company's Safety Rules

Finally, the company argues that the trial court erred by excluding Hills's testimony on whether the worker's conduct violated the company's safety rule requiring the use of rubber gloves. The company attempted to elicit from Hills testimony to the effect that the worker's failure to wear rubber gloves was a violation of the company's safety rule pertaining to the use of rubber gloves because, according to Hills, the worker was "within reach of an energized conductor." The worker objected to this line of questioning. The trial court sustained the objection.
As noted above, Hills's opinion testimony would generally be admissible if that opinion were based on firsthand knowledge and if it were helpful to the determination of a fact in issue. Rule 701. Hills testified that he only viewed the scene of the accident from the ground on the day after the accident. He testified that he had not measured the distance between the pop tool, which he said remained in what he believed to be the same position it had been in at the time of the accident, and the energized line. The trial court could have concluded that Hills's testimony was not based on firsthand knowledge and was instead a speculative guess based on a later viewing, from the ground, of the accident scene. The company has not demonstrated that the trial court's decision to exclude this testimony as either being not based on firsthand knowledge or as not being helpful to a determination of the facts in issue was a gross abuse of its discretion; we affirm as to this issue.

VI. Conclusion
We have concluded that the trial court's denial of the company's motion to compel the worker to submit to an FCE cannot be upheld because the trial court was presented no evidence from which it could determine that the worker's refusal to submit to the FCE was reasonable. Therefore, the trial court's decision as to that issue is reversed, and the cause is remanded to the trial court for that court to hold an evidentiary hearing within 90 days from the date of this opinion on the issue whether the worker's refusal to submit to the requested FCE was reasonable.
If the trial court, based on the evidence presented, determines that the worker's refusal to submit to the requested FCE is reasonable, the trial court shall make a return to this court within 120 days from the date of this opinion so indicating. At that point, we will permit the company and the worker to rebrief, if they so request, the FCE issue.
If the trial court, based on the evidence presented determines that the worker's refusal is unreasonable, an FCE shall be ordered and this court shall be so notified. When the results of any FCE conducted are compiled, any experts (medical or vocational) who wish to revise their opinions based upon the results of the FCE may do so, and the trial court shall, if necessary, take additional testimony or consider supplemental depositions in determining the worker's disability rating. Any appeal from that determination shall be a new and separate appeal.
Due to our reversal of the FCE issue, we do not address the company's argument regarding the trial court's determination that the worker was permanently and totally disabled. As to the other challenged aspects of the trial court's judgment, we affirm.
OPINION OF AUGUST 8, 2003, WITHDRAWN; OPINION SUBSTITUTED; APPLICATIONS OVERRULED; *242 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON and PITTMAN, JJ., concur.
YATES, P.J., concurs in the result, without writing.
MURDOCK, J., dissents, with writing.
MURDOCK, Judge, dissenting.
As the main opinion notes, the employer's motion requesting that the trial court order the employee to undergo an FCE relied upon both § 25-5-77(b), Ala.Code 1975, and Rule 35(a), Ala. R. Civ. P., as separate, and independent, grounds for the relief requested. In an appropriate case, either provision could provide the basis for requiring an employee to undergo an FCE. Therefore, if the motion of an employer seeking an FCE is meritorious under either § 25-5-77(b) or Rule 35(a) that motion is due to be granted.
The trial court denied the employer's motionand therefore necessarily denied relief under both § 25-5-77(b) and Rule 35(a)without explanation. The question presented, therefore, is whether the trial court's decision is unsupported by the evidence under either § 25-5-77(b) or Rule 35(a), or is plainly and palpably wrong.
Insofar as the employer's motion was based upon § 25-5-77(b), I reiterate what I stated in my special writing in Ex parte Alabama Power Co.:
"Whether the particular examination at issue . . . should be allowed to go forward, is not dependent, solely or per se, on whether the authorized treating physician under § 25-5-77(a), Ala.Code 1975, has prescribed it. Rather, the test for whether an examination prescribed by the authorized treating physician, or requested by the employer, may be conducted is whether the test, as so prescribed or requested, is `reasonable.' Section 25-5-77(a) contemplates the provision of `reasonably necessary medical and surgical treatment and attention, physical rehabilitation,' etc. (emphasis added [in Ex parte Alabama Power Co.]). Section 25-5-77(b) requires an injured employee to `submit to examination by the employer's physician at all reasonable times.' (Emphasis added.) Moreover, § 25-5-77(b) states that if an injured employee `refuses to comply with [a] reasonable request for examination, or refuses to accept the medical service or physical rehabilitation, which the employer elects to furnish,' the right to compensation under the Act shall be suspended. (Emphasis added [in Ex parte Alabama Power Co.].). . . .
". . . .
". . . [T]he examination in question is one to be conducted under the provisions of § 25-5-77(a) and/or § 25-5-77(b), and the question therefore is . . . whether the examination . . . prescribed by the physician and requested by the employer . . . is reasonable."
Ex parte Alabama Power Co., 863 So.2d 1099, 1105-06 (Ala.Civ.App.2003) (Murdock, J., concurring in the result) (final emphasis added). Accordingly, we must assume in the present case that the trial court determined that the FCE prescribed by Dr. Frye on February 14, 2001, was not reasonably necessary. See, e.g., Ex parte Walters, 580 So.2d 1352, 1354 (Ala.1991) ("[W]here the trial court does not make specific findings of fact, it will be assumed that the trial court made those findings that were necessary to support its judgment, unless the findings would be clearly erroneous.").
In Ex parte Alabama Power Co., I concurred in the result reached by the majority in favor of the employer because the *243 evidence presented in that case supported the conclusion that the physician's prescription of the examination at issue therein (a nonvideotaped FCE) was reasonable.[2] However, unlike the view expressed in the main opinion, my conclusion after carefully reviewing the record in this case is that the record, including the procedural and factual history associated with this case, does provide substantial support for the trial court's determination that the FCE prescribed by Dr. Frye was not reasonably necessary. In other words, I cannot conclude that the trial court was plainly and palpably wrong in deciding that Dr. Frye's prescription of an FCE on February 14, 2001, was not reasonably necessary. I am therefore bound to vote in favor of upholding the trial court's refusal to require an FCE to the extent the employer sought the FCE based upon § 25-5-77(b).
Nor can I find from the record before us that the trial court abused its discretion in denying the employer relief under Rule 35(a). In any event, I note that in its brief to this court the employer fails to make a specific argument based upon Rule 35(a) to the effect that the trial court abused its discretion in denying the employer's motion to compel an FCE.
Based on the foregoing, I respectfully dissent. I would proceed at this juncture to address the issue not addressed by the main opinion, namely, whether the evidence supports the trial court's determination that the worker was permanently and totally disabled.

On Return to Remand
CRAWLEY, Presiding Judge.

I. Facts and Procedural History
Charles E. Malley ("the worker"), a journeyman lineman, was employed by Musgrove Construction, Inc. ("the company"). The company constructs and maintains power lines. The worker was injured when he was electrocuted and then fell from a bucket truck while he attempted to connect a jumper tap line to the main line neutral. The worker suffered severe burn injuries, a torn rotator cuff in his right shoulder, carpal tunnel syndrome in his right hand, headaches and dizziness from striking his head on the ground, and developed depression and post-traumatic stress disorder ("PTSD").
The worker sued the company, seeking workers' compensation benefits. The trial court determined that the worker was permanently and totally disabled. The company appealed that determination, raising as arguments that the worker's misconduct in violating company safety rules precluded his recovery of benefits, that the trial court erred by excluding certain testimony, that the award of permanent and total disability was not supported by substantial evidence, and that the trial court erred by failing to require the worker to submit to a functional capacities evaluation ("FCE"). See Musgrove Constr., Inc. v. Malley, 912 So.2d 227, 231 (Ala.Civ.App.2003) (opinion on original submission) ("Musgrove I"). We affirmed the trial court's judgment on the worker-misconduct issue and the evidentiary issue; however, because the trial court had not held an evidentiary hearing on the FCE issue, we remanded the case back to the trial court for it to hold a hearing before determining whether the worker's refusal to submit to the FCE insofar as it was requested pursuant to Ala.Code 1975, § 25-5-77(b), was reasonable. Based on that holding, we pretermitted discussion of the company's argument that the permanent *244 and total disability determination was not supported by substantial evidence.
On remand, the trial court held an evidentiary hearing at which the worker; Bonnie Blakeney, a paralegal for the company's counsel; Jody Potts Skinner, the company's vocational-rehabilitation counselor; and Thomas H. Chistiansen, the worker's vocational-rehabilitation counselor, testified. In addition, the company submitted the June 2004 deposition testimony of Dr. Karen Frye, Dr. William Denson, and Dr. Eugene Quindlen and excerpts of the 2001 deposition testimony of Dr. Frye, Dr. Quindlen, Dr. Denson, and Dr. Claude Brown, which had been submitted at the original trial. Finally, the company submitted the deposition testimony of Dr. Roland Rivard, an independent medical examiner.
After the hearing, the trial court entered an order finding that the company sought to compel the worker to undergo the FCE as a discovery tool and not as medical treatment. Based on this finding, the trial court analyzed the company's request under Rule 35(a), Ala. R. Civ. P., which governs requests for physical examinations, ultimately concluding that the company had not shown a need for the FCE because it had "failed to prove that an FCE would produce relevant evidence that was not otherwise available to it from other sources in this case." The trial court also made the alternative determination that, even if the FCE were a medical procedure under § 25-5-77(b), the worker's refusal to submit to the FCE was reasonable because the FCE was not calculated to improve the worker's condition or to return him to his former job or one similar in remuneration. The company and the worker have submitted supplemental briefs on the issue of the trial court's refusal to compel the FCE, and we will now consider that issue and the company's argument that the trial court's disability finding was not supported by substantial evidence.

II. Whether the Trial Court Erred by Denying the Company's Motion to Compel the Worker to Undergo an FCE
The company argues that the trial court erred by denying its motion to compel the worker to submit to an FCE. As we noted in Musgrove I, we can affirm the trial court's denial of the motion to compel only if it could properly deny the motion under both Rule 35(a) and § 25-5-77(b). Musgrove I, 912 So.2d at 232. Therefore, although the trial court determined that the company sought the FCE not as medical treatment but as a discovery tool, we must consider the company's request under both possible avenues.

A. Rule 35(a), Ala. R. Civ. P.
Our supreme court has stated that a trial court has broad discretion over whether to grant or deny a Rule 35 motion because of its "`"broad and considerable discretion"'" over discovery matters. Ex parte Wal-Mart Stores, Inc., 729 So.2d 294, 296 (Ala.1999) (quoting Napier v. McDougal, 601 So.2d 446, 447 (Ala.1992) (quoting in turn Iverson v. Xpert Tune, Inc., 553 So.2d 82, 87 (Ala.1989))). However, in Ex parte Wal-Mart Stores, the supreme court did not end its examination of the issue whether a trial court's denial of a Rule 35(a) request was proper with that observation. Instead, the court further explained the proper review of a Rule 35(a) request. Id. at 297-98.
In Ex parte Wal-Mart Stores, the plaintiff, a patron of the store who claimed that he had been injured when battery acid leaked onto his foot, had an expert examine his foot. Ex parte Wal-Mart Stores, 729 So.2d at 296. Wal-Mart desired an examination of the plaintiff's foot by its *245 own expert; however, the plaintiff refused to submit to one. Id. The trial court denied Wal-Mart's request for an examination under Rule 35(a), and Wal-Mart filed a petition for a writ of mandamus. Id. The supreme court denied the petition, determining that the trial court's denial of Wal-Mart's request under Rule 35(a) was not an abuse of discretion. Id. at 298-99.
In determining that the trial court's denial of Wal-Mart's Rule 35(a) request was not an abuse of the trial court's broad discretion, our supreme court set out three criteria a trial court should consider when deciding whether to grant or deny an examination sought pursuant to Rule 35(a). Ex parte Wal-Mart Stores, 729 So.2d at 297.
"Rule 35(a) requires not only that the physical or mental condition of a party be `in controversy,' but also that the party requesting the examination show `good cause' for the examination. In assessing whether the movant has shown good cause for the requested examination, the trial court should consider whether the movant has demonstrated that the examination results would be relevant, whether the movant has shown an actual need for the information to be gotten by an examination, and whether the examination by the movant's expert would preserve the relative equal footing of the parties with respect to the evidence at issue."
Id. (citations omitted).
According to our supreme court, "[a] movant meets the relevancy requirement of Rule 35(a) by showing that the results of the requested examination will tend to make the existence of a fact at issue more, or will make it less, probable." Id. at 297. The court determined that Wal-Mart had met the relevancy test because the results of an examination of the plaintiff's foot would have tended to show that it was either more or less probable that the pain in the plaintiff's foot was caused by battery acid as the plaintiff alleged. Id.
Applying the relevancy factor to the request for the FCE made by the company in the present case, we conclude that an FCE would be relevant in that its results would show that the worker's claimed permanent and total disability is either more or less probable. Thus, the company has met the relevancy requirement.
The supreme court further explained in Ex parte Wal-Mart Stores that "[a] movant meets the `need' requirement of Rule 35(a) by showing that the requested examination will produce some relevant evidence that is not available from other sources." Id. at 298. Because Wal-Mart's expert had already examined the records of the plaintiff's expert and had already given his opinion of the cause of the plaintiff's pain, the court concluded that Wal-Mart had not demonstrated a need for the examination. Id.
In the present case, the company argued to the trial court that it needed an FCE to defend the worker's claim that he was permanently and totally disabled as a result of his work-related injuries. An FCE would demonstrate whether the worker had the strength and capacity to perform certain common work-related tasks like walking, bending, stooping, and lifting. However, in its motion to compel the FCE the company had also stated that none of the worker's physicians had assigned a physical-impairment rating higher than 15% and that one vocational-rehabilitation counselor had opined that the worker was only 52% vocationally disabled as a result of his injuries. Because the company and the worker had deposed the worker's physicians, the company would have had access to a wealth of information regarding *246 the worker's disabilities and any restrictions or limitations placed on him, as determined by each of his physicians, with which to challenge the worker's claim of 100% disability. The company could also use the opinions of the company's vocational-rehabilitation counselor to challenge the worker's claim. Therefore, we conclude that the company did not prove that the relevant information it sought from the FCEi.e., information regarding the worker's ability to perform common work-related taskswas not available through other sources.
The final criteria the supreme court directed a trial court to consider in Ex parte Wal-Mart Stores was whether "the requested examination is necessary to place the parties on an equal footing with respect to the evidence." Id. at 298. In Ex parte Wal-Mart Stores, Wal-Mart had been unable to examine the plaintiff and the plaintiff was arguing that Wal-Mart's expert, who had not personally examined the plaintiff, should not be permitted to testify. Id. Thus, the court concluded that Wal-Mart had demonstrated that it and the plaintiff were on unequal footing with respect to the evidence. Id.
Unlike the situation presented in Ex parte Wal-Mart Stores, the company in the present case has failed to demonstrate that it is not on an equal footing with the worker with respect to the evidence. The medical testimony in this case is from physicians approved by the company; the company has had equal access to those physicians at all times. In addition, the company had a vocational-rehabilitation expert consider the opinions of the physicians and other information to form an opinion on the extent of the worker's vocational disability. Thus, we conclude that the company failed to prove that the FCE was "necessary to place the parties on an equal footing with respect to the evidence." Ex parte Wal-Mart Stores, 729 So.2d at 298.
In conclusion, based on the criteria set out by our supreme court in Ex parte Wal-Mart Stores, and keeping in mind that the trial court has broad discretion in discovery matters, we conclude that the trial court's denial of the company's request for an FCE under Rule 35(a) should be affirmed.

B. Section 25-5-77(b), Ala.Code 1975
The trial court concluded that the company's request for an FCE in the present case was more properly reviewed under Rule 35(a) rather than as a request under § 25-5-77(b). The trial court based its conclusion in large part on Dr. Frye's testimony that the FCE was not medically necessary and testimony that counsel for the company had his paralegal call Dr. Frye to request a prescription for an FCE 3 weeks after Dr. Frye was deposed and approximately 11 months after the worker last sought treatment from Dr. Frye's medical partner. However, the trial court made alternative findings to justify its denial of the company's request under § 25-5-77(b).
Section 25-5-77(b) requires a worker to undergo medical examinations at all reasonable times by a physician of the company's choosing; section 25-5-77(c) requires a worker to undergo vocational rehabilitation if the company requests that the worker do so. If a worker unreasonably refuses to submit to either a medical examination or vocational rehabilitation, workers' compensation benefits must be suspended. § 25-5-77(b) & (d). However, a worker may refuse to submit to medical treatment or vocational rehabilitation if his or her refusal is reasonable. Health Care Auth. of Huntsville v. Henry, 600 So.2d 324, 327 (Ala.Civ.App.1992). The question whether a worker's refusal to submit to a medical examination or vocational *247 rehabilitation is reasonable is a question of fact, Henry, 600 So.2d at 327, and we cannot reverse a trial court's finding on the issue of reasonableness if it is supported by substantial evidence. Jimoco, Inc. v. Smith, 777 So.2d 716, 718 (Ala.Civ.App.2000) (quoting Ala.Code 1975, § 25-5-81(e)(2)). This court has twice affirmed a trial court's refusal to order a worker to undergo a physical examination when the trial court has found that no evidence supports a conclusion that the requested examination "could lead to treatment that would improve the [worker's] condition." Henry, 600 So.2d at 327; see also Jimoco, 777 So.2d at 718-19.
The trial court in the present case found that the worker's refusal to undergo the FCE was reasonable. In its order, the trial court specifically relied on Jimoco and the fact that a trial court could consider whether the requested procedure is reasonably calculated to lead to treatment that would improve the worker's medical condition. The trial court found, relying specifically on Dr. Frye's testimony, that the FCE would not improve the worker's medical condition or return the worker to his former job or to a job similar in remuneration.
Dr. Frye testified that she did not prescribe an FCE for the worker because she did not think she needed one to assign him his restrictions and impairment rating. She said that she did utilize FCE results in her treatment of other patients, especially if she was aiming to rehabilitate the patient so that he or she could return to work. She noted that the worker was unable to return to his former job as a lineman. When questioned about whether an FCE was a medical treatment, Dr. Frye stated that it was not; however, she commented that an FCE could possibly lead to two other forms of medical treatment: work hardening or physical therapy. Dr. Frye stated that, in her medical opinion, neither of those two forms of medical treatment would benefit the worker.
Although Dr. Denson, the neurosurgeon who treated the worker's recurring headaches, dizziness, and neck and shoulder pain, stated that he thought an FCE could be beneficial for determining disability in an objective way, none of the worker's doctors who were deposed in 2004Dr. Frye, Dr. Denson, and Dr. Quindlenrequested that the worker have an FCE. Neither Dr. Denson nor Dr. Quindlen testified that an FCE was required to determine the extent of the disability suffered by the worker in regard to the particular injuries each doctor treated. Neither Dr. William J. Bose, the orthopedist who treated the worker's rotator-cuff injury, nor Dr. Claude Brown, the psychiatrist who treated the worker for depression and PTSD, were deposed on the issue whether an FCE was necessary for their treatment or diagnosis of the worker.
The company's vocational-rehabilitation counselor, Jody Potts Skinner, testified that she would have preferred to have had an FCE when determining the worker's vocational-disability rating. In addition, Skinner noted that she would have been able to compare the results of the FCE with various job descriptions, leading her to better determine what jobs the worker would be able to perform. Skinner, however, stood by her determination that the worker's disability rating was 52% based upon the information that she had reviewed.
The worker's vocational-rehabilitation counselor, Thomas H. Christiansen, testified that an FCE can be very helpful in determining a person's vocational-disability rating; however, he said that he does not consider an FCE to be "the absolute definitive truth" regarding a person's capabilities. When asked about what a vocational-rehabilitation *248 counselor should do when faced with a conflict between the results of an FCE and the restrictions or limitations imposed by a worker's doctors, Christiansen said that the counselor must rely on the doctors and not the results of the FCE. Christiansen further noted that, at times, an FCE is not even helpful because it observes a person's ability to do a particular typical work activity, like sitting for example, for only 30 minutes when Christiansen stated that he needs to know whether a person can perform the activity for an entire 8-hour work day. Christiansen also stated that, in his opinion, an FCE would very likely not have changed his opinion on the worker's vocational-disability rating because Christiansen doubted that an FCE would have demonstrated that the worker was capable of doing more than the information available from his doctors indicated.
The company also presented the testimony of Dr. Roland Rivard, an independent medical examiner, who it proposed to perform and interpret the FCE. Dr. Rivard testified that an FCE provides an objective musculoskeletal-oriented assessment of the individual being examined. He further stated that an FCE is a fair evaluation of a person's ability to perform at work. Dr. Rivard opined that an FCE would be very useful in determining what the worker's limitations were and what activities he could or could not do.
The trial court's determination that the worker's refusal to submit to an FCE is reasonable is supported by substantial evidence. One view of the overall medical evidence indicated that the FCE would, at best, do no more than provide additional evidence regarding the worker's ability to perform certain tasks and that the FCE would not lead to an improvement in the worker's medical condition or return him to his former job or one similar in remuneration. Thus, the trial court's finding that the FCE requested in the present case, like the physical examinations requested in both Henry and Jimoco, was not expected to improve the worker's condition, and its conclusion, based on that finding, that the worker's refusal of the requested FCE was reasonable, is affirmed.

III. Whether the Trial Court Erred in Finding the Worker Permanently and Totally Disabled
The company argues that the trial court erred by finding the worker permanently and totally disabled. The company disputes several specific findings made by the trial court as well as its overall determination that the worker is permanently and totally disabled. Our review of this case is governed by the Workers' Compensation Act, § 25-5-1 et seq., Ala.Code 1975, which states in pertinent part: "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Ala.Code 1975, § 25-5-81(e)(2). Therefore, this court "will view the facts in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996). Further, the trial court's finding of fact is supported by substantial evidence if it is "supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25-5-81(e)(1); see *249 also Ex parte Trinity Indus., 680 So.2d at 268.
Under the Workers' Compensation Act, a worker is permanently and totally disabled if the worker is "incapacitate[d]. . . from working at and being retrained for gainful employment." Ala.Code 1975, § 25-5-57(a)(4)d. A worker is not required to be totally helpless; he or she simply must be unable to perform his or her trade or obtain other gainful employment. Southern Lifestyle Homes v. O'Rear, 628 So.2d 645, 646 (Ala.Civ.App.1993). "Gainful employment means employment similar in remuneration to that earned prior to the injury. Implicit in this is that the gainful employment sought to be restored must be `suitable.' By `suitable' we mean employment which is compatible with the employee's pre-injury occupation, age, education, and aptitude." Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985).
The worker was treated for his burn injuries by Dr. Karen Frye and Dr. Arnold Luterman. Dr. Frye testified in her 2001 deposition that when the worker arrived at the hospital on the date of the accident he was conscious. She said that he had second- and third-degree burns over approximately 12% of his body. Dr. Frye explained that she and Dr. Luterman excised the worker's burn wounds and performed skin grafts on his right arm, his right torso, his groin, and his right foot. According to Dr. Frye, the worker's grafts required one small "touch up" surgery but that, overall, they healed very well. She said that the worker developed a contracture bandan area of extremely taut scar tissueunder his right arm. Although Dr. Frye performed a release of the contracture band during the touch-up graft surgery, a small contracture band remained; Dr. Frye and a plastic surgeon she consulted determined that a release surgery for the remaining contracture band was not medically necessary because the band was only minimally limiting the worker's flexibility and because of the possibility of the development of even more scar tissue as a result of the surgery.
Dr. Frye assigned the worker a 15% physical-impairment rating to the body as a whole. She stated that the worker should avoid standing for prolonged periods, should avoid exposure to heat (either outside or inside in a non-climate-controlled environment), and should be careful of exposure to sunlight. When questioned about whether she felt the worker needed vocational rehabilitation, Dr. Frye stated that "with some [vocational rehabilitation] I would hope there is something he could do. But obviously I don't think he can go back to being a lineman climbing ladders and working out in the heat."
When explaining why she felt it was necessary to restrict the worker from working in the heat, Dr. Frye explained that the worker did not have sweat glands in the grafted areas because a skin graft does not remove the sweat glands from the donor area. She said that the lack of sweat glands could impair the worker's ability to tolerate heat because of his body's inability to sweat in those areas to cool itself.
Dr. Frye also said that she was not sure if the worker would be able to wear a work boot; she said that she thought he would need special inserts for support in any shoe because of the extensive damage to his right foot. She also explained that the worker, regardless of the shoe he was wearing, was more susceptible to the skin on his foot "breaking down." According to Dr. Frye, the grafted skin on the worker's right foot would never be as durable as the skin that normally grows on the foot and excessive standing or walking would irritate the skin and cause it to be more likely *250 to "break down." Dr. Frye commented that, if the worker's skin were to break down, he would be required to stay off of his foot until the skin healed and that, if the skin were badly damaged, another graft might be required.
The worker was treated for his recurring headaches, dizziness, and neck and shoulder pain by Dr. William S. Denson, a neurosurgeon. According to Dr. Denson's testimony, the worker suffered from neuropathological pain as a result of nerve injuries caused by the electrocution or by the fall. Dr. Denson testified that in the early phases of treatment the worker's headaches became less frequent and that they were treatable by medication; however, the worker began having more frequent headaches a few months later. According to Dr. Denson, the worker should not work at heights, should not lift items over 20 pounds, and should not operate hazardous machinery. He assigned the worker a 5% physical-impairment rating based on several factors, but he commented that "I suspect if you look at his overall picture, his disability is substantially more than that." Dr. Denson recommended an occupational assessment, but he commented that he believed it "would be limited in terms of the jobs [the worker] can perform."
The worker was treated for his neck, shoulder, and lower-back pain by Dr. William J. Bose, an orthopedic surgeon. On the worker's first visit, Dr. Bose diagnosed the worker with a cervical strain, a lumbar strain, impingement syndrome aggravated by his fall, and a possible rotator-cuff tear. Further testing revealed that the worker had some preexisting degenerative disc disease and some bone spurring in his right shoulder, but Dr. Bose determined that the fall aggravated the shoulder problem, resulting in impingement syndrome. He also determined that the worker did have a torn rotator cuff. Dr. Bose performed surgery on the worker's shoulder to reduce the impingement and to repair the rotator-cuff tear. The worker underwent physical therapy, which resulted in a return of near normal strength and range of motion. Dr. Bose assigned the worker a 2% physical-impairment rating to the body as a whole. He also restricted the worker from performing overhead work, from climbing ladders, and from lifting more than 50 pounds on a regular basis and more than 75 pounds on an occasional basis. Dr. Bose commented that the worker "can do work, with respect to [his right] shoulder, under the guidelines of his impairment rating."
The worker sought treatment for pain and tingling in his right hand from Dr. Eugene Quindlen. Dr. Quindlen determined that the worker had a mild case of carpal tunnel syndrome. According to Dr. Quindlen, carpal tunnel syndrome develops in 20% to 30% of burn patients. Dr. Quindlen assigned the worker a 2 ½ % physical-impairment rating to the body as a whole; he assigned a 20% physical impairment rating to the worker's right upper extremity. Dr. Quindlen stated that he was not sure about permanent restrictions for the worker, but he commented that any job requiring constant repetitive movements of the right hand and wrist should be excluded. Dr. Quindlen agreed that "to really determine what job would suit [the worker], we would have to do an overall FCE"; however, Dr. Quindlen stated that he did not order an FCE because he was not the primary treating physician and was concerned only with the worker's carpal tunnel syndrome.
The worker also sought treatment from a psychiatrist, Dr. Claude L. Brown, Jr. Dr. Brown diagnosed the worker with PTSD. Dr. Brown explained that the worker reported the following symptoms of *251 PTSD: anxiety, tension, difficulty sleeping, being awakened with the feeling of being startled, loss of appetite, and a fear of lightning and inclement weather. The worker also complained of a general inability to function, feeling uncertain about his future, and a diminished libido. Dr. Brown explained PTSD as follows:
"A post-traumatic stress disorder is a mental disorder associated with what's ordinarily considered an overwhelming stressful condition.
". . . .
"And that this overwhelming of the individual by pain, by fright, so overwhelms the organism, the individual, that various symptoms develop therefrom, those symptoms being typically a heightened state of anxiety and easily to arouse fearfulness, restlessness, of being startled very easily, as [the worker] mentioned, frequent nightmares often revolving around the accident itself or associated things with the accident, thinking about incidents concerning the accident or event or whatever it was or incidences that bring up the recollection of the event, and, again, reacting to these thoughts with anxiety, restlessness, withdrawal, inability to concentrate and do their usual tasks.
"Along with these physical symptoms, say anxiety, heart racing, difficulty eating or sleeping, or as the case may be, physical things, in addition to that the individual sometimes experiences a kind of emotional numbing, a withdrawal emotionally.
"The usual feelings of joyfulness or pleasurableness or socializing, et cetera, they're not interested in. They tend to withdraw, be more inactive and pulled into themselves, be depressed and not function satisfactorily.
"All of those symptoms may well impair the individual's ability to work whatever kind of work they were doing added to whatever effects the physical injuries the individual may have suffered. A combination of these produce that post-traumatic stress syndrome."
Dr. Brown said that, although he did not assign numerical physical-disability ratings as other physicians did, he could assign an impairment rating in the form of an adjective. He said that the worker's impairment was "moderately severe." He said that the worker would have difficulty with listening to and following instructions; with concentration and focus because, as is typical with those suffering from PTSD, the worker is self-preoccupied; with being physically comfortable; and with getting along with other people. When questioned regarding the worker's problems with interpersonal relationships, Dr. Brown explained that PTSD sufferers are "not always subject to exactly calm, traditional thinking and behaving"; he further explained that "the individual [suffering from PTSD] is tense, self-preoccupied, and troubled in all kinds of ways. So the fact that these things bubble over into their interpersonal relationships is par for the course in a way." Dr. Brown believed that the worker may improve with time, but he could not definitively state whether the worker's PTSD would resolve.
The worker's vocational-rehabilitation counselor, Thomas H. Christiansen, testified that the worker was 100% vocationally disabled. Christiansen based his determination on a review of the worker's medical records, the depositions of the various physicians, achievement testing, and an interview with the worker. Christiansen administered the Wide-Range Achievement Test ("WRAT") to the worker, who scored at the seventh-grade level in both reading and math although he had graduated from high school. By far the most significant work history the worker recounted to *252 Christiansen was his extensive experience in the power-line industry. The worker had done some logging work and had trimmed trees. All of the worker's previous work experience involved heavy manual labor.
Christiansen testified that the worker had transferable job skills; however, he explained that the worker's skills were highly specialized skills relating only to the power-line construction industry. Christiansen opined:
"Basically, you had a medium to heavy skilled worker whose skills were fairly specialized, as I mentioned before. He's limited to sedentary to light work, or some portion thereof of either category, with limited mobility or limited ability to stand and walk, which are significant in the light category of work. He's not physically able, due to the multiple restrictions outlined by all his physicians, to return to his former job.
"He has physical and emotional factors that are affecting any opportunity or feasibility, in my opinion, of vocational rehabilitation. Chronic pain, so-so academic skills. So, therefore, I feel that he is not able to go back to doing what he did before as an occupation and is not retrainable in the competitive labor market."
Christiansen was questioned about the worker's ability to perform several jobs. He rejected the following jobs as outside the worker's restrictions and limitations: security guard, cashier, delivery courier, dispatcher, sales clerk, food-preparation handler, grocery-store clerk, and truck driver. Many of the jobs that Christiansen rejected require prolonged standing or walking, which would mean standing for approximately two-thirds of a workday and which Dr. Frye recommended that the worker avoid, while others require dealing with the public, which Dr. Brown indicated was a significant problem for the worker. The job of truck driver, according to Christiansen, does not fall within either the sedentary or light category of work. Christiansen also commented on the worker's inability to focus and concentrate, which would negatively impact his ability to drive for a courier service or to work as a dispatcher.
In contrast, the company's vocational-rehabilitation counselor, Jody Skinner, assigned the worker a 52% vocational disability rating. She said that she had considered the restrictions placed on the worker by Dr. Bose and Dr. Frye  no overhead work, lifting up to 50 pounds regularly and no more than 75 pounds on a occasional basis, no prolonged standing, and limited exposure to heat. She said those restrictions placed the worker in the light to medium category of work and that, therefore, the worker was capable of holding positions such as hotel desk clerk, light delivery courier, general office clerk, security monitor, and security gate tender. When cross-examined about whether she had considered Dr. Denson's 20-pound lifting limitation and Dr. Brown's testimony that the worker suffered from a "moderately severe" mental impairment, Skinner replied that she had not.
The worker himself testified about the problems caused by his various injuries. He admitted that he had become addicted during his treatment to narcotic pain medications. He no longer receives narcotic medication and treats his pain and headaches with large doses of over-the-counter medications like aspirin.
The worker described the problems caused by the extensive wounds on his right foot. He said that he can wear work boots, that he does not wear the orthotic insert because it rubs against one of his grafts, that he cannot wear any low cut shoe because it rubs against his graft, and *253 that he favors his cowboy boots because they seem to give him more support for his foot. He said that he can and does walk distances up to one-half mile but that he stops during the journey to rest and that he "pays for it later" because his foot will hurt. He explained that sometimes he needed to walk to stretch out the skin on his foot when it became tight but that the walking would bother another tender spot on his foot. He also said that his foot was very sensitive to temperature; when it was cold, he said his foot was very cold, but when it was hot, it seemed at times like his foot got moist and the skin became softer and more tender.
The worker explained that the burn to his groin had shortened the length of his step and that it was irritated at times by his clothing or belts. He said that walking helped stretch the skin so that he could take fuller strides but that, as was the case with his foot, walking and stretching the skin also caused discomfort and pain. He remarked that his groin graft was also sensitive to temperatures and that when he sweats and dries off, his skin seems to tighten up.
The worker discussed the effects of the injuries to his right arm as well. He explained that his shoulder injury and his contracture band prevented him from raising his arm higher than parallel to his shoulder. He also mentioned that the carpal tunnel syndrome in his right hand and wrist caused a feeling like having "pins in it all the time" and that using his right hand to write or to grip more frequently caused the carpal tunnel syndrome to "act up."
The worker further explained the neurological and mental effects of his injuries. He explained that he would sometimes get a shooting pain in his head and that two to four times per week he would suffer headaches. He said that he would suffer the occasional bout of dizziness, mostly in the morning, especially if he attempted to get out of bed too quickly or if he leaned his head the wrong way. He described his problems sleeping, which he related to his inability to get comfortable. He also described having difficulty concentrating, periods when he "just goes blank," and memory that "comes and goes." The worker also mentioned his problems dealing with people.
On cross-examination, the worker explained that he did not think that he could stay on his feet all day long even if he could wear work boots and walk, at times, one-half mile. In response to questions concerning his ability to drive, the worker testified that he did not think he could drive all day long because of his foot, although he commented that he could drive "cross ways." He also mentioned that he did not think he could drive a "big truck" because it would pull his shoulder. When questioned about the physical-therapy notes that indicated that he had nearly full range of motion in his shoulder, he commented that "if [the physical therapists] sat there and worked with it all day it's going to stretch for them, but I'll deal with it later on." He also explained that he did not think he had problems sweating, but he commented that, after becoming overheated and sweating, he seemed to cool off and "turn[s] around and gets like [he has] the flu."
The company presented the testimony of Trooper Larry Harkless and Officer Tracy Cummings, who both apprehended the worker for traffic violations after the worker drove at excessive speeds in attempts to evade apprehension. In general, the officers testified that the worker drove the vehicle he was driving during each incident at rates of speed exceeding 55 miles per hour and up to approximately 65 or 70 miles per hour, that he managed *254 to turn his vehicle around while traveling at an increased rate of speed, and that he had, on two occasions, attempted to or succeeded in evading the officers by running away. The worker explained that he had, on one occasion, run a short distance into the woods after wrecking the vehicle he was driving but that then he had walked approximately one-half mile to a neighbor's home. On that one occasion, Trooper Harkless had testified that the worker had stumbled once during his escape and that he had run 25 to 30 feet; Trooper Harkless did not follow the worker into the woods.
The record also contains the testimony of Dr. Patricia Boltz, a pain-management specialist, and Terry Breitung, an occupational therapist. The worker was referred to Dr. Boltz for pain management, but she declined to treat the worker when the worker requested Lortab and then became agitated when told the narcotic medication would not be prescribed without an exam. She concluded at the time that the worker may have developed an addiction to Lortab. Breitung testified that the worker had satisfactorily completed physical therapy after his rotator-cuff surgery. He said that the worker's range of motion was not quite normal for his age but that it was "certainly functional."
The company attacks several specific factual findings made by the trial court in its judgment, arguing that certain specific findings are not supported by the testimony at trial. Although there are a few discrepancies between some statements contained in the trial court's findings of fact and the trial testimony, we cannot conclude that those minor differences are a basis for a reversal of the trial court's judgment. The testimony of the vocational-rehabilitation counselors were in sharp conflict, and the testimony revealed that the worker was able to do things that his physicians indicated he could not or would not be able to do  for example, his being able to wear work boots when Dr. Frye had stated that he likely would not be able to tolerate them. However, conflicts in the evidence are for the trial court to resolve. Sullivan, Long & Hagerty, Inc. v. Goodwin, 658 So.2d 493, 495 (Ala. Civ.App.1994). A trial court may synthesize the evidence presented to reach its own conclusions. See Ex parte Dan River, Inc., 794 So.2d 386, 391 (Ala.2000) (explaining that "a trial court can synthesize a wide range of medical testimony, even conflicting medical testimony, to reach its own conclusions on medical matters"). Moreover, the trial court is not bound by the opinions of experts, and it may consider its own observations and the worker's testimony concerning pain and discomfort in determining the extent of a worker's disability. Compass Bank v. Glidewell, 685 So.2d 739, 741 (Ala.Civ.App.1996); Jim Walter Res., Inc. v. Budnick, 619 So.2d 926, 927 (Ala.Civ.App.1993); see also Alabama Catfish, Inc. v. James, 669 So.2d 917, 919 (Ala.Civ.App.1995).
The trial court chose, based on of the evidence presented, to believe that portion of the evidence that supported a determination that the worker is permanently and totally disabled. Thomas Christiansen, one of the two vocational-rehabilitation counselors who consulted with the worker, testified that the worker was 100% vocationally disabled. Christiansen relied on his review of the depositions of the worker's physicians and his testing and interviewing of the worker to arrive at that conclusion. The worker's physicians each assigned him a permanent-physical-impairment rating, however small, and outlined restrictions on his physical capabilities. In addition, the worker's psychologist, Dr. Brown, assessed the worker as having a "moderately severe" mental impairment, *255 marked by a decrease in functional cognitive abilities such as concentration, listening to and following directions, and calm and rational thinking. Viewing the facts in the light most favorable to the trial court's judgment, as we are required to do, see Whitsett, 652 So.2d at 290, overruled on other grounds by Ex parte Trinity Indus., 680 So.2d at 269, we conclude that the trial court's determination that the worker is permanently and totally disabled is supported by substantial evidence, and, therefore, the trial court's judgment is affirmed.

IV. Conclusion
The denial of the company's request for an FCE, regardless of whether viewed as proceeding under Rule 35(a) or § 25-5-77(b), is affirmed. Insofar as the company sought the FCE as a discovery tool under Rule 35(a), the company failed to prove that the information to be provided by the FCE was not available from other sources and that the FCE was "necessary to place the parties on an equal footing with respect to the evidence." Ex parte Wal-Mart Stores, 729 So.2d at 298. Insofar as the company sought the FCE under § 25-5-77(b) as medical treatment or a medical procedure, the trial court's conclusion that the worker's refusal of the FCE was reasonable because the FCE would not lead to treatment that would improve the worker's condition was supported by substantial evidence. The conflicts in the evidence regarding the worker's degree of disability were resolved in the worker's favor by the trial court; thus, the trial court's determination that the worker is permanently and totally disabled is affirmed.
AFFIRMED.
PITTMAN, J., concurs.
THOMPSON, J., concurs in the result, without writing.
MURDOCK, J., concurs in the result, with writing.
BRYAN, J., concurs in the result, without writing.
MURDOCK, Judge, concurring in the result.
The main opinion discusses Rule 35(a), Ala. R. Civ. P., and § 25-5-77(b), Ala.Code 1975, as if the former is the rule that governs "discovery" requests for medical examinations and the latter governs only those examinations that can be considered "medical procedures," i.e., examinations designed to assess the condition of the employee for purposes of furthering the employee's treatment. The issue of the full import and purpose of § 25-5-77(b) has not been briefed and does not need to be decided in order to resolve this appeal, however. Accordingly, I would not limit the description of the import of § 25-5-77(b) as does the main opinion.
In this regard, I note that § 25-5-77(b) begins merely by stating that
"[i]f requested to do so by the employer, the injured employee shall submit to examination by the employer's physician at all reasonable times, but the employee shall have the right to have a physician of his or her own selection present at the examination, in which case the employee shall be liable to the physician of his or her own selection for his or her services."
This provision does not specify whether an examination thereunder is to be for purposes of discovery or to further the medical treatment of the injured employee. Section 25-5-77(b) does continue, however, by stating that both the employer and the employee can have a physician present at the examination contemplated by the first sentence of that subsection and that
"[i]f a dispute arises as to the injury, or as to the extent of the disability therefrom, the court may, at the instance of either party or of its own motion, appoint a neutral physician of good standing *256 and ability to make an examination of the injured employee and to report his or her findings to the court, the expense of which examination shall be borne equally by the parties."
(Emphasis added.) Section 25-5-77(b) also goes on to provide for testimony to be given by the examining physicians contemplated by the first sentence of that subsection and also states that any such physician "shall, upon written request of the injured employee or his or her employer and without consent of or notice to the employee or employer not making the request, furnish the injured employee or his or her employer a written statement of his or her professional opinion as to the extent of the injury and disability." Commenting on the duty of a physician examining an employee under § 25-5-77(b) to testify and to provide a written statement of his or her professional opinion as to the extent of the employee's injury and disability, this court explained in Ex parte Alabama Power Co., 863 So.2d 1099, 1102 (Ala.Civ.App. 2003), that "[t]hese additional roles specified by the Legislature indicate that the duty of the authorized physician is to simultaneously further two objectives of the [Workers' Compensation] Act: making the employee as well as possible and assessing the extent to which the employee is capable of earning a living after a workplace injury."
At least one commentator appears to consider § 25-5-77(b) as providing the employer a discovery tool. See 2 Terry A. Moore, Alabama Workers' Compensation § 24:34 (Supp.2004). Citing both § 25-5-77(b) and Rule 35, Ala. R. Civ. P., Moore's treatise states:
"Section 25-5-77(b) states that an employee must submit to a medical examination by the employer's physician when requested to do so at all reasonable times, subject to the right of the employee to have a physician of his or her own selection at the examination at the expense of the employee. In cases of a dispute as to causation or disability, the statute authorizes either party to move the court to appoint a neutral physician of good standing to examine the employee and make findings to the court, with each party sharing the costs of the examination equally. Additionally, Rule 35 of the Alabama Rules of Civil Procedure allows an independent medical examination in certain circumstances. The employer may avail itself of any of these alternatives as part of the discovery process, but the request is not due to be granted in every circumstance."
Id. (footnotes omitted; emphasis added). See also 1 Terry A. Moore, Alabama Workers' Compensation § 16:51, p. 746 (1998) (noting that for a request for examination under § 25-5-77(b) to be deemed reasonable, "that request should be made while the case is still pending or after the case has been reopened for alteration, amendment or revision of the judgment").
NOTES
[1] The worker testified and pictures of the accident scene show that the power line on which the worker was working had two neutral lines. According to the worker, the "old" neutral line had recently been lowered so that the lineman could install a "new" neutral line. The "new" neutral line was approximately three feet below the energized line, while the "old" neutral line was approximately four to five feet below the energized line. Unless otherwise indicated, all references to the neutral line are to the "new" neutral line.
[2] Specifically, I concluded in Ex parte Alabama Power Co. that there was not substantial evidence in the record to support a finding that the examination was unreasonable.